## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cr-0015** |
| | ) | |
| **JOHN JACKSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**APPEARANCES:**

**Gretchen C.F. Shappert, United States Attorney**
**Everard E. Potter, AUSA**
United States Attorney's Office
St. Thomas, U.S.V.I.
     *For the United States of America,*

**Matthew Campbell, Federal Public Defender**
**Melanie Lark Turnbull, AFPD** (argued)
**Kia Danielle Sears, AFPD**
Office of the Federal Public Defender
St. Thomas, U.S.V.I.
     *For John Jackson.*

## <u>MEMORANDUM OPINION</u>

**MOLLOY, J.**

    **BEFORE THE COURT** is Defendant John Jackson's motion to supress physical evidence, filed on September 23, 2019. (ECF No. 58.) The United States (the "Government") filed an opposition on October 9, 2019. (ECF No. 70.) The Court held an evidentiary hearing on October 31, 2019. After hearing testimony and the arguments of counsel, the Court took the matter under advisement and ordered the parties to submit supplemental briefs on several legal issues.[1] Both parties submitted their respective supplemental briefs on

---

[1] The Honorable Curtis V. Gomez presided over the evidentiary hearing. This case was reassigned to the undersigned judicial officer on May 8, 2020. Although the undersigned did not preside over the evidentiary hearing and was not able to evaluate the credibility of the witnesses, based on a reading of the transcript and reviewing the briefs submitted by the parties, the Court finds that issues surrounding the credibility of any

November 7, 2019. For the reasons stated below, the Court will grant the motion to suppress in part and deny in part.

## I.   FACTUAL AND PROCEDURAL HISTORY

The relevant facts in this case that pertain to the motion before the Court were adduced during the course of an October 31, 2019 omnibus hearing in this matter. The Court heard testimony from several witnesses, including Homeland Security Investigations ("HSI") Special Agent Alicia Blyden ("Agent Blyden"). The Court also received evidence in the form of a February 23, 2019 search warrant and its accompanying affidavit and attachments. That testimony and evidence revealed the following facts.

Agent Blyden testified that John Jackson ("Jackson") initially came to the attention of HSI after they received information that Jackson had sexually assaulted a fifteen-year old minor. On February 21, 2019, special agents interviewed R.L., the fifteen-year old minor and alleged victim. In that interview, R.L. stated that on January 18, 2019, Jackson transported her from near Ivanna Eudora Kean High School to his residence located at 5B-5 Mandahl, St. Thomas, U.S. Virgin Islands. R.L. also described the vehicle in which she was transported as a red Acura.

R.L. further alleged that, after arriving at the residence, Jackson took her to his bedroom where they engaged in sexual intercourse. R.L. stated that, while they were having sex, she was unaware that Jackson was videotaping them having sex on her cell phone. Subsequently, Jackson showed the video to R.L. while they were both sitting on his bed. R.L. reported that she told Jackson to delete the video. R.L. additionally reported that Jackson informed her that he would delete the video from R.L.'s cell phone after he had sent the video to his own phone.

During the February 21, 2019 interview, the HSI Special Agents also showed R.L. a picture taken from a video that had been extracted from her phone. The video depicts two individuals engaged in sexual intercourse, but faces are not shown. R.L. confirmed that she was one of the persons in the photo. Additionally, R.L. identified the adult male's hand seen

witness are largely not in dispute. Thus, there is no need for the undersigned to reconvene a hearing to hear testimony.

in the photo as Jackson's hand. R.L. also identified the residence where the alleged sexual assault occurred.

On February 23, 2019, the Government sought a search warrant for Jackson's residence at 5B-5 Mandahl and his vehicle, a Red Acura TSX. In support of the warrant application, Agent Blyden executed an affidavit. The affidavit included the aforementioned details from the February 21, 2019 interview of R.L. The affidavit also included two attachments. One of the two attachments, "Attachment A," described the property to be searched—5B-5 Mandahl and a Red Acura TSX more particularly described by its license plate number and vehicle identification number. "Attachment B" stated the list of items to be seized.

The magistrate judge signed the search warrant that same day. The warrant incorporates, by reference, Agent Blyden's affidavit and the two attachments. Specifically, the face sheet of the warrant authorized a search of "[t]he residence of John Jackson located at 5B-5 Mandahl St. Thomas, V[.]I. (the Subject Premises), and [a] Red Acura TSX, [] more fully described in Attachment A" for "[e]vidence of violations of 18 U.S.C. Sections 2251(a), 2252(a) and 2252A as more [fully] described in the Affidavit of Alicia Blyden and the accompanying attachment A and B incorporated herein." The face sheet of the warrant gives no other description of the items sought. The warrant further directs law enforcement to "leav[e] a copy of this warrant and receipt for the . . . property taken" if any item listed in attachment B is seized.

Agent Blyden further testified that, prior to executing the warrant, she "met with the other agents from HSI and CBP Air and Marine." Excerpted Omnibus Hr'g Tr. at 7:8-9, ECF No. 79. Agent Blyden testified that the purpose of that meeting was to brief the agents on the execution of the search warrant, including a discussion of the scope of the search. *See id.* at 7:11-17. Further, Agent Blyden testified that she understood the scope of the search warrant "was, as stated in the warrant, it was for evidence of child pornography." *Id.* 6:25-7:1.

Agent Blyden testified that, at approximately 6:00 p.m. on February 23, 2019, HSI agents, with Agent Blyden as lead case agent, executed the search warrant. While at Jackson's residence, HSI agents seized various items including electronics, jewelry, alleged drug

*United States v. Jackson*
Case No. 3:19-cr-0015
Order
Page 4 of 25

paraphernalia, brownies, and a pillow. Agent Blyden made the final determination as to which items should be seized from Jackson's residence.[2]

That same night, Agent Blyden served Jackson with the face sheet of the warrant and an inventory of the seized items. Attachment A and Attachment B were not included.[3] Agent Blyden testified the she did not know that she was required include Attachment A and Attachment B with the face sheet of the warrant when she served the face sheet of the warrant and the inventory of seized items on Jackson.[4]

> [BY THE GOVERNMENT:]
>
> Q. Now, Agent Blyden, the affidavits, why didn't you leave the affidavit with the attorney?
>
> A. The affidavit?
>
> Q. Sorry, the attachments?
>
> A. Why I didn't leave it with the attorney?
>
> Q. Yes.
>
> A. I did not know that I had to leave it with the attorney.

---

[2]     [BY THE GOVERNMENT:]
Q. And as the lead case agent, tell us what, if anything, you did specifically?
A. Specifically to the search?
Q. With respect to the search?
A. Okay. In respect to the search of the residence, once I was in the residence and the agents would, had questions, if to, like, seize items, I would say yea or nay because I had more knowledge in reference to the case and the items to be seized. So, I had to give the final yea or nay before that item is seized and placed in the seizure box.
Q. Were any items seized that you did not verify or confirmed?
A. No.
Excerpted Omnibus Hr'g Tr. at 9:9-22, ECF No. 79

[3] Agent Blyden also testified that Jackson's attorney arrived at Jackson's residence during the search and inquired regarding the search warrant. Agents provided Jackson's attorney with only the face sheet of the warrant. *See* Excerpted Omnibus Hr'g Tr. at 10:2-21, ECF No. 79.

[4] Agent Blyden had Attachment A and Attachment B with her during the search of Jackson's residence.

[BY THE GOVERNMENT:]
Q. Okay. Now, Attachments A and B, do you know if the warrant was incorporated in the -- where were Attachments A and B?
A. I had it in my search warrant folder.
Q. And where was the search warrant folder?
A. It was in the residence.
Q. Of Mr. Jackson?
A. Of Mr. Jackson.
*Id.* at 10:22-11:4.

Q. Did you leave the attachments with the defendant, at the defendant's home?

A. No, I did not leave the attachments with the defendant.

Q. Why didn't you leave the attachments with the defendant?

A. Because I did not know, from my knowledge and experience of being an agent with Homeland Security Investigations since May of 2007.

Excerpted Omnibus Hr'g Tr. at 13:11-14:2, ECF No. 79. Agent Blyden further testified that, during her time as an agent, her practice in executing warrants has been to leave only the face sheet of the warrant and an inventory of items seized.

[BY DEFENSE COUNSEL:]

Q. Now, you have been an agent since 2007, correct?

A. Yes.

Q. You have conducted various search warrants, correct?

A. Yes, I have.

Q. You have helped with search warrants and led search warrants, correct?

A. Yes.

Q. Okay. And in your time as an HSI Special Agent, you leave the first copy, the page, the first page of a search warrant, correct?

A. Yes, you leave the warrant.

Q. And then a list of the inventory, right?

A. And a list of the inventory.

Q. And then you leave?

A. And then I leave?

Q. Yes, you leave the premises, correct?

A. Upon leaving the premises, you do that, depending on the circumstances.

*Id.* at 17:25-18:18.

After the search of Jackson's residence, the Government filed a criminal complaint against Jackson on February 25, 2019.

On February 28, 2019, the Government sought and obtained a search warrant for certain items, including a Gucci bracelet, brownies, a pillow, a green leafy substance appearing to be marijuana, and a pink bag containing drug paraphernalia, plastic bags, and

what appears to be marijuana, that had been seized from 5B-5 Mandahl, St. Thomas, V.I. during the February 23, 2019 search.

The Government filed a sequence of charging documents thereafter. Most recently, on June 6, 2019, the Grand Jury returned a Second Superseding Indictment charging Jackson with eleven counts. Those eleven counts include two counts charging production of child pornography in violation of 18 U.S.C. § 2251(a), three counts charging transportation of a minor with intent to engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a), one count charging first degree rape in violation of 14 V.I.C. § 1701, and five counts charging aggravated second degree rape in violation of 14 V.I.C. § 1700a(a).

On September 23, 2019, Jackson filed a motion to suppress any evidence recovered in the search executed on February 23, 2019.[5] In his motion to suppress, Jackson argues that the February 23, 2019 search warrant lacked probable cause, failed to satisfy the particularity requirement, and was overbroad.[6] Jackson also argues that the execution of the warrant violated his Fourth Amendment rights because when the warrant was presented to him, it did not contain a particularized list of the items to be seized. Finally, Jackson argues that any items seized outside the scope of the February 23, 2019 search warrant must be suppressed.

On October 9, 2019, the Government filed an opposition to Jackson's motion to suppress.

At the conclusion of the October 31, 2019 omnibus hearing, the Court asked the parties for additional briefing on two issues: (1) whether the failure to serve Jackson with the attachments to the warrant violated the Fourth Amendment; and (2) if there was a violation, what remedy is appropriate under the circumstances presented here.

---

[5] Jackson also filed a motion to suppress statements allegedly obtained in violation of *Miranda*. After receiving evidence and hearing argument, the Court denied that motion for the reasons stated on the record at the October 31, 2019 omnibus hearing.

[6] At the time Jackson filed his motion to suppress, he had received the face sheet of the February 23, 2019 search warrant, but not the affidavit supporting the warrant or the attachments identifying the property to be searched and the items to be seized. As such, Jackson's arguments were based solely on the information present on, or absent from, the face sheet of the February 23, 2019 search warrant.

On November 7, 2019, Jackson and the Government each submitted a response to the Court's inquiry.

## II.    LEGAL STANDARD

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Such probabilities "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231. "Probable cause can be, and often is, inferred from 'the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence].'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (alterations in original). As such, when issuing a warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

Where a defendant challenges a warrant for lack of probable cause, "[t]he role of a reviewing court is not to decide probable cause *de novo*, but to determine whether 'the magistrate had a substantial basis for concluding that probable cause existed.'" *Stearn*, 597 F.3d at 554 (quoting *Gates*, 462 U.S. at 238). "[S]uch deference 'does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions.'" *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) (citations omitted). "But it does mean that 'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *Id.*

In addition to probable cause, "[t]he Fourth Amendment by its terms requires particularity in the warrant." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). "The requirement that warrants shall particularly describe the things to be seized makes general searches

under them impossible and prevents the seizure of one thing under a warrant describing another." *United States v. Tracey*, 597 F.3d 140, 146 (3d Cir. 2010) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). "In order for a warrant to be invalidated as general, it must 'vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence.'" *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (citations omitted).[7] "Along with preventing general searches, the particularity requirement serves two other functions." *Tracey*, 597 F.3d at 146. It "memorializes precisely what search or seizure the issuing magistrate intended to permit," *Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004), and informs the subject of the search "of the lawful authority of the executing officer, his need to search, and the limits of his power to search," *Groh*, 540 U.S. at 561 (citations omitted) (internal quotation marks omitted).

The Fourth Amendment permits a warrant to satisfy the particularity requirement by cross-referencing other documents. *Groh*, 540 U.S. at 557. Indeed, "an affidavit may be used in determining the scope of a warrant that lacks particularity if the warrant is 'accompanied by an affidavit that is incorporated by reference.'" *Tracey*, 597 F.3d at 146-47 (quoting *United States v. Johnson*, 690 F.2d 60, 64 (3d Cir. 1982)). "'[T]o take advantage of this principle of interpretation, the warrant must expressly incorporate the affidavit,' and the incorporation must be 'clear.'" *Id.* at 147 (citations omitted). "As with the particularity requirement, the primary purposes of this incorporation rule are to 'limit the [officers'] discretion as to what they are entitled to seize' and 'inform the subject of the search what can be seized.'" *Id.* at 147 (citations omitted). Significantly, the execution of a warrant violates a defendant's Fourth Amendment rights when, "as presented to [the defendant], it [does] not contain a particularized list of items to be seized." *United States v. Franz*, 772 F.3d 134, 144 (3d Cir. 2014).

---

[7] "[E]xamples of general warrants are those authorizing searches for and seizures of such vague categories of items as 'smuggled goods,' 'obscene materials,' 'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas,' 'illegally obtained films,' and 'stolen property.'" *Id.* (citations omitted).

Where evidence is obtained in violation of the United States Constitution, the exclusionary rule prohibits the use of such evidence at trial in certain circumstances. *See Herring v. United States*, 555 U.S. 135, 139 (2009). "The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Id.* at 140. "[T]he exclusionary rule is not an individual right and applies only where it result[s] in appreciable deterrence." *Id.* at 141 (citations omitted) (internal quotation marks omitted). Further, "the benefits of deterrence must outweigh the costs." *Id.* As such, "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 143. Thus, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144. Significantly, "[t]he pertinent analysis of deterrence and culpability is objective." *Id.* at 145.

## III.   DISCUSSION

Jackson first argues that the February 23, 2019 search warrant was not supported by probable cause because there was no reason to believe that the search warrant would uncover any evidence in Jackson's residence or vehicle of production of child pornography in violation of 18 U.S.C. § 2251(a) or child exploitation in violation of 18 U.S.C. § 2252(a) and 18 U.S.C. § 2252A.[8]

---

[8] Jackson also argues that the February 23, 2019 search warrant failed to satisfy the particularity requirement and was overbroad. Jackson argues that the warrant lacked the requisite particularity because the warrant describes the things to be seized solely as evidence of violations of 18 U.S.C. §§ 2251(a), 2252(a), and 2252A and provides no other guidance concerning the items to be seized. However, Jackson's argument is flatly contradicted by the record. As previously noted, Jackson made such argument prior to receiving Agent Blyden's affidavit and Attachment B which accompanied the warrant application when presented to the magistrate judge. Significantly, the February 23, 2019 search warrant explicitly incorporated Agent Blyden's affidavit and Attachment B. Attachment B listed nine different categories of items to be seized including (1) images and files of child pornography, (2) records evidencing occupancy and ownership of the premises to be searched, (3) records evidencing ownership or use of computer equipment on the premises to be searched, (4) lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct, (5) notes and other activities with minors visually depicted while engaged in sexually explicit conduct, (6) materials and photographs depicting minors engaged in sexual conduct, (7) any of the items described in the previous categories that are stored on computer media, (8) cell phones assigned to Jackson, and (9) iPads. The Court finds that the February 23, 2019 search warrant—when read as a whole, including Agent Blyden's affidavit and Attachment B—imposed meaningful limits on what agents could search for such that the warrant satisfied the particularity requirement. *See, e.g., United States v. Karrer*, 460 F. App'x 157, 161 (3d Cir. 2012) (holding that a search warrant which authorized agents "to search and seize virtually all computer-related items in [the

Here, Agent Blyden's application for the February 23, 2019 search warrant sought authorization to search "[t]he residence of John Jackson located at 5B-5 Mandahl[,] St. Thomas, V[.]I. (the Subject Premises), and [a] Red Acura TSX, [] more fully described in Attachment A" for "[e]vidence of violations of 18 U.S.C. Sections 2251(a), 2252(a) and 2252A as more [fully] described in the Affidavit of Alicia Blyden and the accompanying attachment A and B incorporated herein." To show that evidence of violations of 18 U.S.C. §§ 2251(a), 2252(a), and 2252A existed in Jackson's residence and vehicle, the affidavit of Agent Blyden relied on (1) the information elicited during the February 21, 2019 interview of R.L., the alleged minor victim, and (2) a description of the video of the alleged sexual assault that had been extracted from R.L.'s cell phone. Specifically, the affidavit stated that (1) R.L. described being transported in Jackson's vehicle to his residence where the alleged sexual assault occurred, (2) R.L. reported that, unbeknownst to her, Jackson recorded the alleged sexual assault on her cell phone, and (3) R.L. reported that Jackson stated that he would send the video of the alleged sexual assault to his own cell phone. The affidavit also stated that R.L. identified herself and Jackson in the video. Further, the affidavit described the video as depicting sexual intercourse between Jackson and R.L.

This description of the video meets the legal definition of a "visual depiction," *see* 18 U.S.C. 2256(5), involving the use of a "minor," *see* 18 U.S.C. 2256(1), engaging in "sexually explicit conduct," *see* 18 U.S.C. 2256(2)—possession, production, and distribution of which are prohibited by 18 U.S.C. §§ 2251(a), 2252(a), and 2252A. Given that there was information presented to the magistrate judge that Jackson engaged in both producing and distributing the video—by reportedly using R.L.'s cell phone to record the video and stating that he would

---

defendant's] home" was sufficiently particular where "the warrant identified particular devices and file types to be searched for evidence of a specific statutory offense").

With respect to his argument that the February 23, 2019 search warrant was overbroad, Jackson makes no attempt to delineate the factual or legal basis for such argument. Accordingly, the Court finds that Jackson has waived any argument that the February 23, 2019 search warrant was overbroad. *See, e.g. United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *United States v. Loya*, 807 F.2d 1483, 1487 (9th Cir. 1987) ("Issues raised in a brief which are not supported by argument are deemed abandoned.").

send the video to his own cell phone—the Court finds that the magistrate judge had a substantial basis for concluding that probable cause existed to search Jackson's residence and vehicle for evidence of violations of 18 U.S.C. §§ 2251(a), 2252(a), and 2252A. *See United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (finding that probable cause to search the defendant's residence for prohibited images of a minor existed where the affidavit in support of the warrant was based on information provided by the minor victim, who reported that she had engaged in sexual intercourse with the defendant and the defendant had taken several nude photographs of her with his cell phone); *cf. United States v. Vosburgh*, 602 F.3d 512, 527 (3d Cir. 2010) (holding that probable cause supported a warrant where the affidavit tied the images of child pornography to the defendant using his IP address, a "fairly unique identifier[]"); *United States v. Contreras*, 905 F.3d 853, 858 (5th Cir. 2018) (holding that probable cause to search a residence for evidence of child pornography existed where agents presented information that a cell phone connected to the residence's WiFi network had uploaded several images of child pornography to a mobile messaging application).

Jackson also argues that the February 23, 2019 search of his residence violated his Fourth Amendment rights under *Franz* because, as presented to Jackson at the time of the search, the warrant did not contain a particularized list of the items to be seized. As such, Jackson argues that all evidence obtained from the February 23, 2019 search of his residence must be suppressed.

In *United States v. Franz*, 772 F.3d 134 (3d Cir. 2014), the Bureau of Land Management ("BLM") learned that Robert Franz ("Franz") may have stolen several paleontological items from BLM-managed land in Alaska and smuggled them to his house. *Franz*, 772 F.3d at 139. BLM Agent Joseph Nardinger prepared the warrant application. *Id.*

> Where the face sheet of the warrant asked for a description of the property that the agents expected to seize, it read, "See attached sheet." One of the attachments, Attachment B, listed a series of items to be seized, including the [several paleontological items], maps of Alaska, financial records,

> photographs, emails, and any related information contained on computer hard
> drives or other electronic storage devices.

*Id.* A magistrate judge approved the warrant (the "Nardinger Warrant"). *Id.* Thereafter, the United States Attorney moved to seal the search warrant, affidavit, and accompanying papers, citing "the government's interest in protecting cooperating witnesses, maintaining the secrecy of grand jury investigations, and ongoing criminal investigations." *Id.* The magistrate judge granted the motion. *Id.*

Subsequently, BLM agents executed the warrant. *Id.* Franz was present at the time, and Nardinger provided Franz with a copy of the face sheet of the warrant. *Id.* Nardinger did not give Franz copies of the warrant attachments, even when Franz requested them. *Id.* Nardinger believed that, because the warrant and affidavit had been sealed, he could not reveal those attachments. *Id.* Nevertheless, Nardinger thoroughly described the items the warrant authorized him to seize. *Id.*

Franz filed a motion to suppress all evidence collected pursuant to the Nardinger Warrant. *Id.* at 140. Among other things, Franz argued that the Nardinger Warrant failed to satisfy the Fourth Amendment's particularity requirement. *Id.* The district court ruled that because Nardinger did not provide Franz with Attachment B to the warrant, which described the items to be seized, the warrant was facially invalid when it was executed. *Id.* Nevertheless, based on Nardinger's behavior and its conclusion that no appreciable deterrent effect would be gained by applying the exclusionary rule, the district court denied Franz's motion to suppress. *Id.* at 140-141. After conviction, Franz appealed. *Id.* at 141

The Third Circuit affirmed, finding that "application of the exclusionary rule would provide little deterrent effect and would not justify the costs of suppression." *Id.* at 149. Initially, the Third Circuit explained that "[t]he Nardinger Warrant was facially valid when issued but the execution of it violated Franz's Fourth Amendment rights because, as presented to Franz, it did not contain a particularized list of items to be seized." *Id.* at 144 (citing *Bartholomew v. Com. of Pa.*, 221 F.3d 425, 429-30 (3d Cir. 2000)). Nevertheless, the Third Circuit further explained that "both the Supreme Court's precedents and our own have been consistent in requiring a case-specific analysis of whether the exclusionary rule applies, rather than a categorical approach." *Id.* at 145.

In light of the factors to consider for triggering application of the exclusionary rule, the Third Circuit concluded that "Nardinger's conduct was, on the whole, objectively reasonable." *Id.* at 147. The Third Circuit opined:

> He sought and obtained a valid warrant and acted in consultation with federal prosecutors. . . . The District Court found that Nardinger had "no intention of concealing the subject matter of the warrant or the information on Attachment B." In executing the search, Nardinger explained to Franz what items the warrant authorized him to search for and seize, and the agents did not exceed the scope of that authorization. . . . While Franz disputes that the search of his home was appropriately limited, he has not established and, given the record, cannot establish that the District Court's finding on that point was clearly erroneous. Finally, the District Court concluded that Franz presented no evidence that the constitutional violation in question was "recurring or systemic." Although Franz argues on appeal that "this case is [a] small example of the systemic problems in criminal investigatory practices that are sanctioned through legal counsel," he has cited no support for that bald assertion. Here, an inexperienced agent made a mistake, but it appears to have been only that: an isolated mistake.

*Id.* at 147-48 (citations omitted). Moreover, the Third Circuit found that their conclusion was confirmed "by looking at the magistrate judge's order sealing the attachment, which Nardinger thought prohibited him from showing the attachment to Franz." *Id.* at 148.

> The order stated that "agents executing the search warrant are authorized, as required by Fed.R.Crim.P. 41(d), to leave a copy of the search warrant and a receipt for the property seized with the person searched or at the property searched." As the District Court noted, that language is somewhat unclear, and the officer understood from it that he was authorized to leave the warrant face sheet and an inventory but not the supporting documents. In *Sheppard*, the Supreme Court emphasized that a reasonable officer should be expected to rely on a judge's assurances that a particular course of action is authorized, not to disregard those assurances. . . . Even though Nardinger was mistaken, his reliance on the sealing order mitigates the blame that necessarily follows his error.

*Id.* at 148-49 (citations omitted).

The Third Circuit considered a similar issue in *United States v. Wright*, 493 F. App'x 265 (3d Cir. 2012) ("*Wright I*") and *United States v. Wright*, 777 F.3d 635 (3d Cir. 2015) ("*Wright II*"). In *Wright I*, Randall and Michael Wright (the "Wright brothers") were suspected by the DEA of using their apartments to sell marijuana. *Wright I*, 493 F. App'x at 266. DEA Agent Taylor ("Agent Taylor") sought warrants, supported by an affidavit of

probable cause, for the search of the Wright brothers' apartments. *Id.* at 266-67. A magistrate judge issued the warrants. *Id.* at 267. The warrants were executed on the same day. *Id.* During the search of each of the Wright brothers' apartments, DEA agents recovered certain amounts of guns, ammunition, cash, marijuana, and assorted drug paraphernalia. *Id.* Thereafter, a grand jury indicted the Wright brothers for violations of various drug and firearms statutes. *Id.* The Wright brothers moved to suppress the evidence found during the search of their apartments, arguing that the warrants were invalid. *Id.*

> During a suppression hearing before the district court, Agent Taylor testified that:

> an ordinary warrant request begins with three documents: an affidavit of probable cause, a warrant application, and a face sheet. . . . The warrant application and face sheet are both preprinted forms with blank spaces in which the applicant is instructed to describe the person or property to be seized. It is common for applicants to fill in these sections by writing, "See ATTACHMENT A" or "See ATTACHMENT B." Attachment A is normally a description of the property to be searched, and Attachment B is normally a listing of the items to be searched for or seized.

> . . . Upon approval [of the warrant application], the Magistrate Judge signs the face sheet, and the face sheet becomes the warrant.

*Id.*

With respect to the warrant requests for the each of the Wright brothers' apartments, the items-to-be-seized section of each face sheet was filled in with the words, "SEE ATTACHED AFFIDAVIT OF PROBABLE CAUSE," and the items-to-be-seized section of the warrant application with the words, "SEE ATTACHMENT A." *Id.* ATTACHMENT A described the properties to be searched, rather than the items to be seized. *Id.* While the AFFIDAVIT OF PROBABLE CAUSE described the items to be seized, it was impounded and sealed before the warrants were executed. *Id.*

Following *Bartholomew v. Com. of Pa.*, 221 F.3d 425, 429-30 (3d Cir. 2000) (holding that "generally speaking, where the list of items to be seized does not appear on the face of the warrant, sealing that list, even though it is 'incorporated' in the warrant, would violate the Fourth Amendment."), the district court found that the warrants failed to meet the particularity requirement. *United States v. Wright*, 730 F. Supp. 2d 358, 365 (E.D. Pa. 2010). After rejecting the government's argument that the good faith exception should apply, the

*United States v. Jackson*
Case No. 3:19-cr-0015
Order
Page 15 of 25

district court granted the Wright brothers' suppression motions. *Wright I,* 493 F. App'x at 268. The government appealed. *Id.*

Rejecting the government's request that it reconsider *Bartholomew*, the Third Circuit agreed that the warrants were invalid on their face. *Id.* at 269-71. Nevertheless, the Third Circuit remanded for the district court to find sufficient facts regarding law enforcement culpability for the exclusionary rule analysis required by *Herring. Id.* at 271. Upon remand, the district court denied the motion to suppress, finding that Agent Taylor's failure to review the warrant before executing it was a "simple mistake" that conferred no benefit on the Government and amounted at most to negligence. *United States v. Wright*, No. CRIM. 09-270-ALL, 2013 WL 3090304 (E.D. Pa. June 20, 2013). Michael Wright appealed.

In *Wright II*, the Third Circuit affirmed. Comparing to *Franz*, the Third Circuit noted that, unlike Agent Nardinger, Agent Taylor had "extensive experience with search warrants and did not interpret the magistrate judge's sealing order as excusing compliance with the particularity requirement." *Wright II*, 777 F.3d at 639. As such, the Third Circuit explained that "Agent Taylor [was] arguably more culpable than Agent Nardinger." *Id.* at 640. Nevertheless, because the Third Circuit found that it was "difficult to assess" whether Agent Taylor was "'grossly' negligent or merely negligent in the 'ordinary' sense," it found that it "[made] sense to consider (1) the extent to which the violation in this case undermined the purposes of the Fourth Amendment and (2) what the Government gained from the violation." *Id.*

> The requirement that warrants particularly describe the things to be seized has a number of purposes. First, it provides written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned. Second, it prevents general searches by confining the discretion of officers and authorizing them to seize only particular items. Third, it informs the subject of the search of the lawful authority of the executing officer, his need to search, and the limits of his power to search.

*Id.* (citations omitted) (internal quotation marks omitted).

*United States v. Jackson*
Case No. 3:19-cr-0015
Order
Page 16 of 25

Regarding the purposes of particularity requirement, the Third Circuit found that the first two purposes had not been undermined:

> This was no general search, as Agent Taylor oversaw it and "assured that the [other] officers acted in accordance with the warrant's limits." . . .
>
> Furthermore, we can be confident that the magistrate judge found probable cause to search for and seize every item listed in Agent Taylor's affidavit. When the warrant was approved, the affidavit was attached and expressly incorporated by reference in the space for identifying the items to be seized. Indeed, in addition to signing the warrant, the magistrate signed the affidavit, albeit for the purpose of certifying that Agent Taylor had sworn to it.

*Id.* at 640-41 (citations omitted). At the same time, the Third Circuit found that the third purpose had been undermined because Wright was not informed of the limits of the agents' power to search. *Id.* at 641. The Third Circuit again noted that *Franz*, in which Agent Nardinger had verbally explained to Franz what items the warrant authorized agents to search for and seize, presented a more compelling case for declining to apply the exclusionary rule. *Id.* Nevertheless, the Third Circuit observed that it was unclear how the failure to inform Wright of the list of items to be seized harmed him. *Id.* Moreover, "[e]ven if the list of items to be seized had been present at the scene, the agents would have collected precisely the same evidence." *Id.* As such, the Third Circuit found that "the Government gained nothing from the Fourth Amendment violation." *Id.* In conclusion, the Third Circuit explained that:

> In the context of suppression [] the Supreme Court has unequivocally held that deterring isolated negligence is not worth the social cost of excluded evidence. Only if mistakes of this nature recur with some frequency will a criminal defendant be in a position to argue that the calculus has changed.

*Id.* at 642 (citations omitted).

Here, there is no dispute that the face sheet of the warrant does not contain a particularized list of items to be seized. Moreover, there is no dispute that when Agent Blyden executed the warrant on Jackson's residence, Agent Blyden did not present Jackson with the attachments that were incorporated in the warrant, including Attachment B which lists the items to be seized. Thus, as presented to Jackson, the warrant did not contain a particularized list of items to be seized. As such, the execution of the warrant violated Jackson's Fourth Amendment rights.

While the Government concedes that the execution of the warrant was inconsistent with the Fourth Amendment under *Franz*, the Government nevertheless argues that application of the exclusionary rule is not warranted here under the analysis set forth in *Wright II*.

The actions of Agent Blyden in this case present a number of similarities to *Wright II*. Like the agent in *Wright II*, there is no evidence that Agent Blyden informed Jackson, or his attorney,[9] what items agents were authorized to search for and seize. Additionally, Agent Blyden is an experienced law enforcement officer who has executed a number of search warrants, both as a participant of the search team and as the search team leader, throughout her twelve-year career[10] at HSI. Further, there is no evidence that Agent Blyden interpreted the magistrate judge's order issuing the warrant, or any of the directives on the face sheet of the warrant, as excusing compliance with the particularity requirement. Indeed, Agent Blyden testified that she did not provide the attachments with the face sheet of the warrant because, in her twelve-year experience at HSI, she was simply unaware that she was required to do so. Significantly, Agent Blyden's failure to provide the attachments to the warrant, describing the places to be searched and the list of items to be sought and seized, was not an isolated mistake. Typically, she provides only the face sheet of the warrant and an inventory of the items seized. As such, Agent Blyden was arguably more culpable than both the agent in *Franz* and the agent in *Wright II*. Indeed, the violation in this case arguably evidences a pattern of recurrent negligence.

It is troubling to this Court that a veteran law enforcement officer, operating within the jurisdiction of the Third Circuit Court of Appeals, was not aware of binding Third Circuit precedent regarding the proper procedure for executing a warrant in compliance with Constitutional requirements, especially where such precedent had been settled in this Circuit for a number of years prior to the warrant execution in this case. Indeed, this is not the only instance in which a veteran law enforcement officer before this Court has testified

---

[9] Agent Blyden testified that Jackson's attorney was present during a portion of the search and "asked about the warrant." *See* Excerpted Omnibus Hr'g Tr. at 10:2-11, ECF No. 79.

[10] Agent Blyden testified that she has been a special agent at HSI since 2007. *See* Excerpted Omnibus Hr'g Tr. at 2:22-24, ECF No. 79.

that he or she was unaware of the requirement that warrants as served must include a particularized list of the items to be seized. *See United States v. Merchant*, No. CR 2018-0017, 2019 WL 3997266, at *3 (D.V.I. Aug. 23, 2019) ("[DEA Task Force Officer ("TFO") President] testified that, although he had received training in executing search warrants, he did not recall being instructed that he should serve attachments, only that he should provide a copy of the search warrant itself. TFO President stated: '[T]hat is the way I've always done it. I've never been questioned or told about it.'"). This arguably suggests that agencies within this jurisdiction are failing to train their agents regarding the proper procedure for executing a warrant in compliance with Constitutional requirements. This is especially concerning to the Court given that "[r]esponsible law-enforcement officers [should] take care to learn 'what is required of them' under Fourth Amendment precedent and [] conform their conduct to these rules." *Davis v. United States*, 564 U.S. 229, 241 (2011) (citations omitted). Despite this concern, the Court is not convinced that suppression is warranted under the analysis performed in *Wright II.*

Considering the extent to which the violation in this case undermined the purposes of the Fourth Amendment, the Court notes that, as in *Wright II*, when the warrant was approved, the affidavit and attachments listing the items to be seized were attached and expressly incorporated. Indeed, as in *Wright II*, in addition to signing the warrant, the magistrate judge signed the affidavit, albeit for the purpose of certifying that Agent Blyden had sworn to it. The affidavit specifies that the list of items to be searched and seized is set forth in Attachment B. As such, the Court can be confident that the magistrate judge found probable cause to search for and seize every item listed in Attachment B. Further, as in *Wright II*, Agent Blyden oversaw the search and made the final determination as to which items should be seized from Jackson's residence. Indeed, not one item was seized without Agent Blyden's approval. Significantly, Agent Blyden also had Attachment B in her search warrant folder with her in the residence during the search. Moreover, Agent Blyden met with the search team prior to the search to discuss the scope of the search, which Agent Blyden understood to be confined to evidence of child pornography. As such, the Court can be confident that the search was appropriately confined within the limits of the warrant and

was not a general search.[11] At the same time, there is no evidence that Jackson or his attorney were informed of the lawful authority of the executing officers, their need to search, or the limits of their power to search. Thus, as in *Wright II*, the third purpose of the particularity requirement was undermined.

Nevertheless, just as in *Wright II,* it is unclear in this case how Jackson was "harmed by his inability to peruse the list of items the Government intended to seize." *Wright II*, at 641. Significantly, "[t]he absence of a constitutional requirement that the warrant be exhibited at the outset of the search, or indeed until the search has ended, is . . . evidence that the requirement of particular description does not protect an interest in monitoring searches." *United States v. Grubbs*, 547 U.S. 90, 99 (2006) (citations omitted) (internal quotation marks omitted). Indeed, the Supreme Court has explained that "[t]he Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, *ex ante*, the 'deliberate, impartial judgment of a judicial officer . . . between the citizen and the police' and by providing, *ex post*, a right to suppress evidence improperly obtained and a cause of action for damages." *Id.* (citations omitted).

Moreover, the Government gained nothing from the Fourth Amendment violation in this instance. Here, as in *Wright II*, even if Agent Blyden had presented Jackson with the particularized list of items to be seized on Attachment B, agents would have executed the warrant and recovered precisely the same evidence. Significantly, "but-for causality is . . . a necessary . . . condition for suppression." *Hudson v. Michigan*, 547 U.S. 586, 592 (2006).

Given the circumstances outlined above, the Court finds that Agent Blyden's failure to present Jackson with the particularized list of items to be seized in this case does not warrant application of the exclusionary rule.

Jackson's final argument pertains to several items seized during the February 23, 2019 search which he argues fall outside the scope of the warrant, and thus must be

---

[11] Agents did seize certain items outside the scope of the warrant. The Government contends that those items were seized under the "plain view" exception to the warrant requirement, the merits of which the Court discusses below. Significantly, "the seizure of an object in plain view . . . does not convert the search into a general or exploratory one." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

suppressed. Those items include a Gucci bracelet, brownies, a pillow, a green leafy substance appearing to be marijuana, and a pink bag containing drug paraphernalia, plastic bags, and what appears to be marijuana. The Government does not dispute that those items fell outside the scope of the February 23, 2019 search warrant. Nevertheless, the Government contends that those items fall under the "plain view" exception to the warrant requirement.[12]

Under the "plain view" exception, evidence obtained without a warrant need not be suppressed so long as three requirements are met. "First, the officer must not have violated the Fourth Amendment in 'arriving at the place from which the evidence could be plainly viewed.' Second, the incriminating character of the evidence must be 'immediately apparent.' Third, the officer must have 'a lawful right of access to the object itself.'" *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (quoting *Horton v. California*, 496 U.S. 128, 141 (1990)).

Here, the February 23, 2019 search warrant authorized agents to search Jackson's residence and vehicle for and seize, among other items, digital memory cards and any

---

[12] As discussed *supra* in the factual and procedural history, the Government sought and obtained a search warrant for the items it contends were seized pursuant to the plain view exception *after* such items had been seized. As such, because the Government concedes that those items fell outside the scope of the February 23, 2019 search warrant, the Court finds those items were seized without a warrant. "In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983). "[O]nce the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). To satisfy its burden, the Government presented Agent Blyden, who was present and testified at the October 31, 2019 omnibus hearing. Curiously, the Government did not seek to introduce the February 28, 2019 search warrant or the affidavit in support of that warrant—for which Agent Blyden was the affiant—at the October 31, 2019 omnibus hearing. Nor did the Government request that the Court take judicial notice of those documents, which are sealed under a separate case number before the Court. Because the affidavit in support of the February 28, 2019 search warrant was not introduced at the October 31, 2019 omnibus hearing, Jackson did not have the opportunity to object or cross examine Agent Blyden regarding the content of that affidavit. As such, the Court declines to take judicial notice of that document *sua sponte. Cf. United States v. Glass*, 744 F.2d 460, 461 (5th Cir. 1984) ("This court cannot treat the affidavit, sealed under protective order by the magistrate and never before the district court during the suppression hearing, as a part of the record of that hearing. . . . The affidavit is hearsay. The declarant was presented as a witness and testified. Had the affidavit been tendered to supplement [the declarant's] testimony, [the defendant] would have had an opportunity to object and to cross examine [the declarant] about its content. [The defendant] would be denied that opportunity and the chance to discredit the information supplied in an affidavit he never saw if we were to take judicial notice of the affidavit as the government requests."). As such, the affidavit in support of the February 28, 2019 search warrant is not part of the record in this matter. Thus, the Court will not consider any facts therein alleged to have been known to law enforcement at the time of the seizure.

electronic data storage devices including flash memory devices that could contain child pornography. Significantly, "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820-21 (1982). Digital memory cards and flash drives may exist in very small sizes. As such, the February 23, 2019 search warrant authorized agents to search any area and open any container that could conceal such devices. *See Ross*, 456 U.S. at 821 (explaining that "a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found"). Given this, the Court concludes that the first and third requirements of the "plain view" exception are satisfied here.[13]

With respect to second requirement of the "plain view" exception, the "immediately apparent" standard does not require an "unduly high degree of certainty as to the incriminatory character of evidence," or that "a police officer 'know' that certain items are contraband or evidence of a crime." *Texas v. Brown*, 460 U.S. 730, 741 (1983). Rather, officers must possess only "probable cause to associate the property with criminal activity." *Id.* at 741-42 (emphasis omitted) (citations omitted) (internal quotation marks omitted); *see also United States v. Scarfo*, 685 F.2d 842, 854 (3d Cir. 1982) ("[a]n article need not be inherently incriminating; the incriminating nature of an object is generally deemed apparent where police have probable cause to believe it is evidence of a crime."). "[P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' that certain items may be

---

[13] The Government presented testimony from Agent Blyden that the brownies were found on a kitchen counter, the Gucci bracelet was found in a backpack in the living room, and the pillow was found on the bed in Jackson's bedroom. As such, these items were all clearly in plain sight from a place agents were authorized to access during the search of the residence. Inexplicably, the Government did not present any testimony or record evidence regarding where the alleged marijuana or pink bag and its contents were found. The Government merely argues that those items "were found in plain view by agents who were lawfully on the property." *See* Government's Opp'n to Def.'s Mot. to Exclude Physical Evidence at 5, ECF 70. Nevertheless, because the Court cannot conceive of any area in Jackson's residence or vehicle that could conceal the alleged marijuana or pink bag and its contents but not conceal a digital memory card or flash device, the Court must conclude that agents (1) did not violate the Fourth Amendment in arriving at the place from which those items could be plainly viewed and (2) had a lawful right of access to those items.

*United States v. Jackson*
Case No. 3:19-cr-0015
Order
Page 22 of 25

contraband or stolen property or useful as evidence of a crime." *Brown*, 460 U.S. at 742

(quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

Here, Agent Blyden testified that she recognized the seized Gucci bracelet as being

identical to the bracelet she observed in the video of the alleged sexual assault of the minor

victim in this case.

[BY THE GOVERNMENT:]

Q. What else did you find?

A. Cell phones, iPads. We also found a Gucci hand chain that was in a backpack
that was located in the living room. When I opened the backpack, I found a, I
believe it was like a utility bill that had John Jackson's name on it, and that's
when I found the hand chain. And I remember the hand chain because the hand
chain was identical to the hand chain that I saw on the child pornography video
that the victim identified herself being in.

Excerpted Omnibus Hr'g Tr. at 12:23-13:7, ECF No. 79. Agent Blyden also testified that she

recognized the seized pillow from the video of the alleged sexual assault of the minor victim.

[BY THE GOVERNMENT:]

Q. Well, what was the significance of the pillow?

A. The significance of the pillow. When I showed her the still photo, I asked
her, what is that in the still photo. The still photo came from the child
pornography video that was retrieved from her phone. When I asked her, what
is that, that object, she stated that that object was John Jackson's pillow that he
had on the bed at the time that she – he videotaped her having sex with him.

Q. Okay. Did she give a description of the pillow?

A. She said orange and pink, I believe.

Q. And when you were at Mr. Jackson's residence and you found the pillow –
describe the pillow.

A. The pillow was like orange, pinkish in color, more, you know, looked kind of
like a tiger print, but orange and pink.

*Id.* at 12:7-12:22. Coupled with the video depicting the alleged sexual assault of a minor—in

which the Gucci bracelet and pillow appeared—and the minor victim's allegations in this

case—including that Jackson produced and distributed that video—the Court finds that

there was probable cause to associate the Gucci bracelet and pillow with criminal activity.

As such, the Court concludes that the "plain view" exception applies to these two items. *Cf.*

*United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) (rejecting the argument that an

empty ammunition box seized by police was "no more incriminating than a cigar box used to store children's pencils" and affirming the plain view exception because "[c]oupled with the seized drugs, weapons, and photographs, the ammunition box [was] probative of the use of weapons in connection with drug trafficking in violation of federal law").

The Court further finds that, given Agent Blyden's twelve years of experience as HSI during which time her duties have included investigating drug smuggling, *see* Excerpted Omnibus Hr'g Tr. at 3:3-12, ECF No. 79, the incriminating character of the green leafy substance appearing to be marijuana and the pink bag containing drug paraphernalia, plastic bags, and what appeared to be marijuana was immediately apparent. *See, e.g., United States v. Alatorre*, 863 F.3d 810, 816 (8th Cir. 2017) (finding that the "incriminating character of the drug paraphernalia—which included a marijuana joint, a bag of mushrooms, a line of white powder, among other drug paraphernalia—was immediately apparent" where law enforcement found the drug paraphernalia in plain view during a protective sweep of a residence). As such, the Court concludes that the "plain view" exception applies to these two items.

With respect to the seized brownies, the entirety of the record evidence presented by the Government consists of the following testimony from Agent Blyden:

[BY THE GOVERNMENT:]

Q. In conducting the search, tell us what items you found in the residence of significance?

A. Of significance, items that we found were -- we found green leafy substance that tested positive for marijuana. We found -- as we entered the apartment, there was a counter, like the kitchen counter, and there was some brownies that was wrapped in like a plastic, like individually wrapped. They were sitting on the counter. We found those, that were later tested positive for the presence of marijuana.

Q. Why did the brownies have significance to you?

A. The brownie had significance because the minor victim, the 15-year-old, stated that she was given brownies by Mr. John Jackson.

Excerpted Omnibus Hr'g Tr. at 11:14-12:2, ECF No. 79.

Based on such a sparse record, it is not clear to the Court how agents would have had probable cause to believe that the brownies sitting on the kitchen counter were either

contraband or evidence of a crime. Indeed, there was no testimony or evidence here that Jackson was suspected of possessing or distributing any type of controlled substance, in any form. While a green leafy substance appearing to be marijuana was found somewhere in Jackson's residence,[14] there is no record evidence connecting the discovery of that substance to the brownies such that a suggestion might arise that the brownies contained marijuana. As such, the Court finds that nothing in Jackson's criminal history or the environment surrounding the brownies suggested the brownies might be contraband. Further, there was no testimony that, based on Agent Blyden's experience, knowledge, or training, any specific characteristics of the brownies indicated they might contain illicit drugs. Indeed, the Government did not elicit any testimony regarding whether the packaging of the brownies, or any markings thereon or other visible characteristic,[15] might indicate to a trained law enforcement officer that the brownies contained marijuana. The only testimony regarding the packaging of the brownies was that they were individually wrapped in plastic. Without any evidence to indicate that such packaging is somehow distinct to marijuana brownies— as opposed to otherwise innocuous brownies—the Court finds that there was no probable cause, or even reasonable suspicion, to believe that the brownies were contraband. *Cf. Brown*, 460 U.S. at 743 (concluding that an opaque balloon containing heroin was validly seized pursuant to the plain view exception in part because "the distinctive character of the balloon itself spoke volumes as to its contents -- particularly to the trained eye of the officer"); *United States v. Benish*, 5 F.3d 20, 25 (3d Cir. 1993) (concluding that the incriminating character of a marijuana plant seized by law enforcement was "immediately apparent" where an officer testified he knew the item was a marijuana plant because "[w]e have free time we have classes and things on marijuana, paraphernalia recognitions[,] [j]ust from school and criminology classes"); *United States v. Jones*, 503 F. Appx. 174, 177 (3d Cir. 2012) (concluding that heroin was validly seized pursuant to the plain view exception where

---

[14] As the Court previously noted, the United States did not present any evidence or testimony regarding the circumstances surrounding the discovery of the green leafy substance appearing to be marijuana. Indeed, the sole evidence in the record regarding the green leafy substance is that it was "found in the residence" and "tested positive for marijuana." Excerpted Omnibus Hr'g Tr. at 11:14-18, ECF No. 79.

[15] There is no evidence as to whether there were any markings on the brownies.

an officer testified that "he could see the heroin plain as day" and that he recognized its distinctive packaging based on his prior experience).

The only record evidence that might be argued to suggest the brownies seized on February 23, 2019, were evidence of a crime is the statement of the minor victim that Jackson gave her brownies. Significantly, the record contains no evidence regarding the circumstances under which Jackson gave the alleged minor victim brownies or whether those brownies even contained marijuana. Without any apparent connection between the brownies Jackson gave to the minor victim on an unknown date[16] and the brownies seized on February 23, 2019, the Court finds that agents did not have probable cause to believe the brownies seized on February 23, 2019, were evidence of a crime. Thus, the Court concludes that the "plain view" exception does not apply to the brownies seized on February 23, 2019.

## IV.    CONCLUSION

For the reasons outlined above, the Court finds that the magistrate judge had a substantial basis for concluding that there was probable cause to search Jackson's residence and vehicle for evidence of child pornography. Further, while the execution of the February 23, 2019 search warrant violated Jackson's Fourth Amendment rights because, as presented to Jackson, the warrant did not contain a particularized list of items to be seized, the Court finds that suppression of the evidence recovered during the search is not warranted. Finally, the Court finds that the "plain view" exception to the warrant requirement does not apply to the brownies seized on February 23, 2019, from Jackson's residence.

An appropriate Order follows.

**Dated:** January 4, 2021                    */s/ Robert A. Molloy*
                                              **ROBERT A. MOLLOY**
                                              **District Judge**

---

[16] The United States did not elicit any testimony regarding when the brownies were allegedly given to the minor victim.